K. Rachel Lanier (SBN 343171)
Rachel.Lanier@lanierlawfirm.com
**THE LANIER LAW FIRM, P.C.**
2829 Townsgate Rd Suite 100
Westlake Village, CA 91361
Telephone: (713) 659-5200

W. Mark Lanier (*pro hac forthcoming*)
WML@lanierlawfirm.com
Alex J. Brown (*pro hac forthcoming*)
Alex.Brown@lanierlawfirm.com
John Davis LaBarre (*pro hac forthcoming*)
Davis.LaBarre@lanierlawfirm.com
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204

***Attorneys for Plaintiffs***

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LEANDRO CABO, ERICA LEEDS, KATHY BIBBY, SEAN FLOOD, VARDAN BALAYAN *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>SEQUOIA CAPITAL OPERATIONS, LLC, ARMANINO LLP, and PRAGER METIS CPAS, LLC,<br><br>Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1
PARTIES ........ 6
JURISDICTION AND VENUE ........ 8
FACTUAL BACKGROUND ........ 9
A. The Rise of FTX and Alameda ........ 9
B. FTX Insiders ........ 11
i. Bankman-Fried ........ 11
ii Caroline Ellison and Sam Trabucco ........ 12
iii. Gary Wang ........ 15
iv. Nishad Singh ........ 17
C. FTX's Scheme and Its Collapse ........ 19
D. Sequoia's Involvement in and Facilitation of FTX's Scheme ........ 37
i. History of Sequoia and Key Players ........ 37
ii. Sequoia Invests and Promotes FTX ........ 38
E. The FTX Accountants ........ 48
CLASS ACTION ALLEGATIONS ........ 55
A. Class Definitions ........ 55
(1) Global Class ........ 55
(2) Nationwide Class ........ 56
(3) California Subclass ........ 56
B. Requirements of Rule 23(a) ........ 56
1. Numerosity ........ 56
2. Commonality/Predominance ........ 57
3. Typicality ........ 58
4. Adequacy of Representation ........ 58
C. Requirements of 23(b)(3) ........ 58
1. Predominance ........ 58

2. Superiority....................59

D. Requirements of 23(b)(2)....................60

E. Requirements of 23(c)(4)....................60

F. Nature of Notice to the Proposed Class....................60

CAUSES OF ACTION....................61

COUNT ONE – Aiding and Abetting Fraud – (Plaintiffs individually and on behalf of the Classes against Sequoia, Armanino, and Prager)....................61

COUNT TWO – Civil Conspiracy - (Plaintiffs individually and on behalf of the Classes against Sequoia, Armanino, and Prager)....................62

COUNT THREE – Aiding and Abetting Conversion (Plaintiffs individually and on behalf of the Classes against Sequoia, Armanino, and Prager)....................64

JURY TRIAL DEMAND AND PRAYER FOR RELIEF....................64

Plaintiffs Leandro Cabo, Erica Leeds, Kathy Bibby, Sean Flood, and Vardan Balayan individually and on behalf of all others similarly situated (collectively "Plaintiffs"), file this action against Sequoia Capital Operations, LLC's ("Sequoia"), Armanino LLP, ("Armanino"), and Prager Metis CPAs LLC ("Prager") (collectively "Defendants"). Defendants aided and abetted, and in many instances, actively participated in fraud perpetrated by FTX Trading LTD d/b/a FTX ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US ("FTX US") (collectively, the "FTX Entities" or "FTX"). By and through his undersigned attorneys, The Lanier Law Firm, Plaintiffs file this class action under Federal Rule of Civil Procedure 23 on their own behalf and on behalf of the class or classes they represent to obtain compensatory damages, rescission or a rescissionary measure of damages, declaratory relief, and costs of suit, including reasonable costs and expenses incurred in this action, attorney fees, and expert fees. Plaintiffs complain and allege as follows:

## <u>INTRODUCTION</u>

1. On November 11, 2022, the largest financial fraud in U.S. history came to a head when the Former FTX CEO, Sam Bankman-Fried ("Bankman-Fried"), announced *via* Twitter that FTX, FTX US, and Alameda filed for voluntary Chapter 11 Bankruptcy.




2. From the outside looking in, Bankman-Fried and FTX were very successful.

Investors valued FTX and its U.S. operations at a combined $40 billion. Ostensibly, FTX was a platform where investors could garner safe returns on cryptocurrency trades that other financial institutions could not offer. But Bankman-Fried was using FTX as his own personal checking account, whereby he took investors' monies and spent it to cover his sister business and live a life of luxury. In reality, FTX was nothing more than a mere "Ponzi scheme."

3. The FTX disaster is the largest financial fraud in U.S. history. Bankman-Fried now faces numerous criminal charges, and the new CEO—who helped wind down Enron—has concluded that this fraud is worse than Enron. Billions of dollars were stolen from investors across the world and have still yet to be found.

4. FTX was a centralized cryptocurrency platform which specialized in derivatives and leveraged products. It filed for Chapter 11 bankruptcy protection on November 11, 2022. These proceedings will take place for years to come. There is little possibility that any victims of Bankman-Fried and FTX's "Ponzi scheme" will ever recover from those proceedings. And it is almost certain that these proceedings will make no victim whole.

5. This class action represents the most viable avenue for the victims of Bankman-Fried and FTX's fraud to recover any of their damages. This action is specifically brought against Venture Capital Defendant, Sequoia and Accountant Defendants, Armanino and Prager Metis CPAs, whose conduct helped perpetuate Bankman-Fried's and FTX's fraud.

6. Sequoia was complicit in and responsible for some of these fraudulent losses because it knowingly poured hundreds of millions of dollars into FTX, essentially funding the scheme by which FTX directed customer deposits to Alameda Research ("Alameda"), a cryptocurrency trading firm co-founded by Bankman-Fried, and which is also bankrupt. Sequoia, along with other venture capital firms, early funding was critical to boosting FTX's credibility, FTX's investors' trust in Bankman-Fried and the FTX's leadership, and the perceived legitimacy of the FTX trading platform.

7. Armanino and Prager Metis were complicit in and responsible for some of these fraudulent losses because they knew or should have known that their work, as the retained accounting firms for FTX, would be used to entice third parties to entrust FTX with their assets.

Both accounting firms gave FTX and its entities a clean bill of "financial health" while profiting immensely and growing their own "crypto" sections of their accounting firms.

8. This is not a case where Plaintiffs made "risky" investments in stock or cryptocurrency; nor did they lose money speculating on various, essentially underground, cryptocurrency tokens or projects. Instead, Plaintiffs' claims arise simply from the purchase of assets and investment on the FTX platform.

9. FTX was portrayed to Plaintiffs as safer than a bank account, and as an investment opportunity that was "very safe" and "protected." FTX portrayed itself as the crypto Chase Bank that was "too big to fail." This is the narrative FTX listed in its terms and conditions and the narrative its CEO, Bankman-Fried, peddled *via* social media and politics. This is the narrative that FTX created in its advertisement campaign that cost millions of dollars. FTX hired celebrities and aired prime-time ads to push this false and misleading agenda.

10. FTX's narrative was a blatant lie and proved to be completely false from inception. Over the three years of FTX's existence, it consistently and improperly transferred billions of dollars of FTX investor funds, including its own token (FTT)[1] to Alameda, a trading firm founded and controlled by FTX founder and then-CEO, Bankman-Fried. These illegal transfers propped up Alameda and lined Bankman-Fried's and his friends' pockets with Plaintiffs' assets.

11. According to a Reuters report, last year Bankman-Fried secretly transferred ***at least $4 billion*** in customer funds from FTX to Alameda after Alameda incurred a series of losses. And FTX lent more than ***half*** of its ***$16 billion*** in ***customer funds*** to Alameda throughout FTX's existence, with more than ***$10 billion in loans outstanding at the end of FTX's***

---

[1] The FTX Token (FTT) started as a utility token that was created to provide traders with a way to save on trading fees. When users pay for their trades using FTT, on the FTX platform, they are given a discount on the fees charged. The more FTT that is used the larger discount the user received. However, FTT slowly turned into a token used for more than utility. It was trading just as any other cryptocurrency. Retail investors perceived FTT to represent the value of FTX, such that any price increase in FTT would benefit holders of FTT equally and in direct proportion to their FTT holdings. In reality, FTT was propped up by Alameda, FTX, and the FTX leadership.

***existence***.[2]

12. Literally overnight, in November 2022, Plaintiffs' assets held on FTX's trading platform were robbed from them as FTX imploded, and Bankman-Fried filed an emergency Chapter 11 bankruptcy petition in Delaware on FTX's behalf. This happened due to "unprecedented" failures and fraud:

> I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.
>
> ***Never*** in my career have I seen such a complete failure of corporate controls and such a **complete absence of trustworthy financial information** as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, **unsophisticated** and **potentially compromised** individuals, **<u>this situation is *unprecedented*</u>**. The FTX Group did not maintain centralized control of its cash. Cash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners around the world.

*See In re: FTX Trading Ltd, et al.*, No. 22-11068 (JTD), ECF No. 24, ¶¶ 4–5, 50 (D. Del. Nov. 17, 2022) (emphasis added).

13. The cryptocurrency national disaster is still growing by the billions. It gets bleaker every day. Crypto companies file for federal bankruptcy petitions daily, all running for protection from the billions of dollars of losses they directly caused to hundreds of thousands of investors in California and across the globe. This is the largest securities national disaster of all time, easily surpassing the Madoff Ponzi Scheme. This fallout will likely create a complex international litigation disaster, similar to hundreds of thousands of asbestos cases which

---

[2] https://markets.businessinsider.com/news/currencies/ftx-crash-client-funds-alameda-binance-sbf-sec-cftc-probe-2022-11?utm_medium=ingest&utm_source=markets (accessed December 16, 2022).

swamped courts all across the world. Unless a workable, coordinated, and organized structure is established now, at the onset of these proceedings, the FTX victims will continue to suffer.

14. FTX's fraudulent scheme was designed to take advantage of unsophisticated investors from across the globe, including in California, who utilize smartphone and tablet applications to make and monitor their investments.

15. Sequoia, a venture capital firm, conspired with FTX, FTX leadership, and Alameda to help facilitate FTX's fraudulent scheme. Sequoia substantially assisted FTX's scheme by knowingly and recklessly (i) funding Bankman-Fried's diversion of FTX's customer funds and (ii) pushing an aggressive public relationship campaign to build trust for FTX and Sequoia's investment and to prop up Alameda. Had Sequoia conducted even a cursory review of FTX's financial statements—and it claims to have done so by conducting due diligence prior to investing—it unquestionably would have been aware of Bankman-Fried's malfeasance. Instead, it persisted with facilitating FTX's fraudulent scheme. All the while Sequoia could boast that its investment in FTX was a true winner, as it appreciated almost to 90% months before FTX's collapse.

16. Accountant Defendants, Armanino and Prager, furthered FTX's conspiracy and fraud by agreeing to contravene basic industry standards in conducting audits and certifying reports. Neither company used "professional skepticism" when looking over FTX's financials and internal controls. The unescapable inference is Armanino and Prager, through their personnel, knew or consciously ignored the nature and extent of the FTX's fraud. Further, both companies promoted FTX on their own social media and used their work as auditors for FTX to build their company brand. Armanino and Prager boasted about their niche expertise in the crypto sphere, and they used the FTX partnership as evidence of that. This gave Bankman-Fried and FTX more credibility in the public eye and drew investors to FTX. Why not? FTX is a legitimate company as two of the top accounting firms found out after extensive audits. While these Defendants furthered the fraud of FTX and Bankman-Fried, they also increased profits and made a name for themselves in the technology and crypto auditing industry.

17. This is a simple case. Bankman-Fried is a fraud. He created two companies that

furthered his fraud, FTX and Alameda. Investors trusted Bankman-Fried and invested with FTX because they believed that it was a "safe place" for their monies. FTX and Bankman-Fried used investors' money to cover Alameda's liabilities and to support Bankman-Fried's opulent lifestyle. Defendants in this case funded FTX at early stages, promoted the company to investors, legitimized FTX's fraudulent financial statements, and ultimately furthered Bankman-Fried's and FTX's fraud. Without Defendants' misconduct, FTX and Bankman-Fried could not have carried out the fraud that has caused a national financial disaster.

## PARTIES

18. Plaintiff Leandro Cabo ("Leandro") is a resident of California. As all of the plaintiffs in this class, Leandro invested his hard-earned money on the FTX platform. His investments included over $500,000.00 worth of different cryptocurrencies including BTC, ETH, Tether, and primarily FTX's own cryptocurrency coin—FTT. [3]

19. In 2022, Plaintiff Leandro Cabo learned of the FTX platform and believed the lie that it was a safe place to invest his monies. Cabo went as far as moving all the cryptocurrency assets that he had purchased on other platforms to the FTX platform because he believed the lies that FTX spread and Defendants legitimized. Cabo, like many of the class plaintiffs, relied on the promises by FTX, FTX's terms and conditions, and Bankman-Fried that FTX was a "risk-free" platform to store cryptocurrency.

20. In reality, Cabo's $500,000.00 worth of investments on FTX's platform was less safe with FTX than it would have been under his mattress. Nor did his investment reap any advertised benefits from the yield bearing function. In November 2022, Cabo lost all of it. He could not recover a dime of the half a million dollars he entrusted to the FTX platform. Cabo lost over $350,000.00 in FTT token value alone. The fraud, deception, and ultimately the crash and bankruptcy of FTX on November 11, 2022, caused Cabo to lose his entire FTX portfolio. Cabo is not alone. Other Plaintiffs have experienced losses based on the same facts.

---

[3] BTC is an abbreviation for Bitcoin. ETH is an abbreviation for Ethereum. BTC, ETH, Tether, and FTT are all cryptocurrency coins.

21. Plaintiff Erica Leeds is a resident of California. She invested $12,000.00 into an interest-bearing account with FTX US on or around April 15, 2022. On November 11, 2022 she had approximately $12,000.00 in her FTX US account. However, when she tried to withdraw her account on the same day she was unable to withdraw the entire account value. She was able to withdraw $8,748.53, but never retrieved the remaining $3,251.47. In fact, her account showed only pennies were left, when in reality FTX owed her $3,251.47. She is one of many more class members who lost their money in the FTX financial collapse.

22. Plaintiff Kathy Bibby is a resident of California. She signed up for FTX on May 24, 2022, after learning that FTX provided a safe platform for storing and investing money. She had $1,049.00 on the FTX platform, and all of her money was in U.S. Dollars. She had no cryptocurrency or other assets in the account. Bibby was truly using it as a savings account. In November of 2022, she attempted to withdraw all the funds she had in her FTX account. The transfer never went through, and Bibby lost the entirety of her investment, close to $1,050.00, due to FTX's inevitable crash. The money that she was going to use toward reopen her business post-Covid-19 was taken from her without any warning. She is one of many more class members who lost their money in the FTX financial collapse.

23. Plaintiff Sean Flood is a resident of California. He signed up for FTX in late 2021 when he saw the false advertising FTX put out on television. He had close to $10,000.00 on the FTX platform and all of his money was in U.S. Dollars. He had no cryptocurrency or other assets in the account. Flood was truly using it as a savings account. On November 11, 2022, he attempted to withdraw all the funds he had in his FTX account. The transfer never went through and Flood lost the entirety of his investment due to FTX's financial crash. He is one of many more class members who lost their money in the FTX financial collapse.

24. Plaintiff Vardan Balayan is a resident of California. Balayan signed up for FTX on February 26, 2022. She invested $6,659.05 into the FTX platform after seeing celebrity advertisements and hearing FTX won the naming rights to the Miami Heat Arena, which would now be called the "FTX Arena." In his words, "I thought FTX was completely legit." He never

recovered the $6,659.05 investment. He is one of many more class members who lost their money in the FTX financial collapse.

25. Defendant Sequoia Capital Operations LLC is a California limited liability corporation with its principal place of business and headquarters in Menlo Park, California. Sequoia focuses on seed stage, early stage, and growth stage investments in private companies across mainly technology sectors. As of 2022, Sequoia's total assets under management were approximately $85 billion. Sequoia was an early investor in FTX and one of the primary promoters of FTX to the financial community, cryptocurrency community, and amateur investors across the world.

26. Defendant Armanino LLP is a California limited liability partnership with its headquarters and principle place of business at 12657 Alcosta Boulevard, Suite 500, San Ramon, California. Armanino claims to be one of the top 25 accounting firms in the United States, with more than 2,000 employees and 24 offices—including ten offices in California. Armanino markets its services to companies in the cryptocurrency arena, stating that its practice "serves digital asset financial service firms, miners & stakers, token projects, and 'crypto-curious' companies … to fulfill the unique needs of industry."

27. Defendant Prager Metis CPAS, LLC is a New York limited liability corporation with its principal place of business at 14 Penn Plaza, Suite 1800, New York, New York, 10122. Prager is an accounting and consulting firm that was engaged by FTX to perform corporate audits. Prager has more than 700 employees in offices around the world, including five offices in California. It was from these California offices that Defendant Prager carried out the conduct alleged herein. Prager strongly markets itself to companies in the technology sphere, including those involved in cryptocurrency.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the action is between multiple members of the class who are residents

and/or citizens of the State of California on the one hand, and the Defendants who are not. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

29. This Court has personal jurisdiction over Defendants because Plaintiffs' claims arise out of Defendants' contacts, acts, and omissions within the State of California such that the exercise of such jurisdiction is consistent with due process under the United States Constitution.

30. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because (1) a substantial part of the events, acts, and omissions that give rise to the claims at issue in this case occurred in this District, (2) Defendants conduct substantial business in this District, and (3) Defendants have caused harm to Plaintiffs and Class Members in this District.

## FACTUAL BACKGROUND

### A. The Rise of FTX and Alameda

31. In 2017, Bankman-Fried, along with Gary Wang, founded Alameda in Berkeley, California. The company quickly grew to approximately 15 employees, including Caroline Ellison and Nishad Singh—who would eventually become part of Bankman-Fried's inner circle. The crypto-trading firm struggled at first, but rose to prominence by arbitraging the price of bitcoin between different markets before venturing into other types of trades and investments in cryptocurrency. While Bankman-Fried rose to fame as Alameda's head trader, he marketed himself as a risk taker and pushed back on subordinates' efforts to slow down his riskier trades and investments.

32. In 2019, Bankman-Fried, along with Wang and Singh, founded the FTX Group of companies, including FTX Trading and FTX US, which began operating as an exchange or marketplace for the trading of cryptocurrency and other assets. FTX also created their own cryptocurrency token—***FTT***.

33. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products (the "Deceptive FTX Platform"). FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms. The exchange was intuitive enough for

first-time users, so that amateurs could place cryptocurrency trade orders themselves. Users like Plaintiffs were offered interest bearing cryptocurrency asset accounts from FTX.

34. One of the attractive features of FTX's digital assets came from its terms of service, which provided that customer assets belong solely to the customer and would not be transferred or otherwise used in FTX's trading. In other words, neither FTX nor FTX US was set up to engage in fractional reserve banking like a traditional bank. Bankman-Fried consistently pushed this agenda while also maintaining that FTX and Alameda were separate and distinct entities.

35. Indeed, FTX's terms of service memorialized this promise:

> 8.2.6. All Digital Assets are held in your Account on the following basis:
>
> (a) ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.*** As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.
>
> (b) ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading;*** FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.
>
> (c) ***You control the Digital Assets held in your Account.*** At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party. (emphasis added).

36. The FTX US terms of service contained similarly reassuring language, stating in relevant part as follows:

> As part of your FTX.US account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency. ***All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit. . . . Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US. . . .FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US.*** (emphasis added).

37. In addition, FTX.US's website contained a document entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms." The document also

represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

38. Through, *inter alia*, media reports, bankruptcy proceedings, social media posts, and in detailed allegations from actions filed by regulators and prosecutors, the statements alleged above regarding the manner of holding, and segregation of, customer assets at the FTX Entities was not only misleading but materially false. In truth, Bankman-Fried and Alameda misappropriated customer assets for their own personal use, proprietary trading purposes, to cover investment loses, among other misuses.

39. Despite the falsity of these representations, all of these efforts had their intended effect: FTX and FTX US grew very quickly. After only three years of business, FTX was valued at $1.2 billion, and Bankman-Fried quickly developed his personal brand and became renowned in the crypto currency and tech space. At its peak, FTX was valued at close to $40 billion, and Bankman-Fried rose to fame as Forbes featured him on the cover of the 40th Annual Forbes 400, ranking him as the forty-first richest individual on the planet. Bankman-Fried was twenty-nine years old at the time.

**B. FTX Insiders**

i. **Bankman-Fried**

40. Prior to founding FTX, the Silicon Valley-born, MIT-educated Bankman-Fried launched his quantitative crypto trading firm, Alameda Research, in November 2017,[4] after stints in the charity world and at trading firm Jane Street.[5] Quantitative trading consists of trading

---

[4] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 4, 2023).

[5] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

strategies based on quantitative analyses, which rely on mathematical computations and number crunching to identify viable trading opportunities.

41. On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in *USA v. SBF*, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id.*, Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money. Defendants, while complicit in Bankman-Fried's misconduct, have thus far escaped criminal liability.

**ii. Caroline Ellison and Sam Trabucco**

42. By 2018, Bankman-Fried had persuaded Ellison to join him at Alameda Research. Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told Forbes magazine in an interview regarding her initial impressions of Alameda.

43. In late 2018, Alameda Research relocated its headquarters to Hong Kong. The team at Alameda Research included Bankman-Fried's close friends (and later co-founders of FTX) Singh and Wang. Ellison and Trabucco were also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

44. After Bankman-Fried established FTX in 2019, Ellison began taking more responsibility at Alameda Research along with Trabucco, who served as CEO.

45. In October 2021, Ellison was appointed co-CEO of Alameda with Trabucco after Bankman-Fried resigned from the firm in an effort to put distance between the exchange and trading shop he founded. As co-CEO, Trabucco helped oversee Alameda's expansion beyond its initial market-neutral, but relatively low-profit business as a market maker for low-volume

cryptocurrencies into riskier trading strategies. For instance, he claimed Alameda traders began exploring yield farming in decentralized finance ("DeFi"). Ellison became sole CEO in August 2022, following Trabucco's departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[6]

46. Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid Bankman-Fried rent and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong. "Young people tend to be too risk averse," Ellison said in a recent Alameda podcast episode.[7]

47. In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. In entering her guilty plea, she told a federal judge in Manhattan:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr.

---

[6] https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed December 16, 2022)

[7] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed December 16, 2022).

> Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.
>
> I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for my actions by pleading guilty.[8]

48. The Wall Street Journal recently reported that Ellison told Alameda staffers in a video call that she was one of four people (along with Bankman-Fried, Wang, and Singh) who

[8] https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (last accessed February 23, 2023)

were aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[9]

**iii. Gary Wang**

49. Gary Wang appears to be unlike his co-founder, Bankman-Fried, who loves fame and putting himself at the center of public attention. Indeed, there is little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

50. Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at MIT, where Wang obtained degrees in mathematics and computer science, and Bankman-Fried received a bachelor's degree in physics.[10]

51. Before co-founding Alameda Research (and later FTX), Wang worked at Google, where he built a system to aggregate prices across public flight data, according to an introduction on the Future Fund's website.[11] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant to join him.

52. The startup has its beginnings in a three-bedroom Berkeley apartment—the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets—including the price discrepancy between BTC in Japan and BTC everywhere else.

53. It was there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder:

---

[9] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed December 16, 2022).
[10] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 16, 2022)
[11] https://ftxfuturefund.org/about/ (accessed December 16, 2022).

"I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[12]

54. Wang, one of the 10 roommates in Bankman-Fried's luxury penthouse in the Bahamas, is reportedly among the four people identified by Ellison who knew about the decision to send customer funds to Alameda.[13]

55. At the age of 28, Wang topped Forbes' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. Bankman-Fried sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[14]

56. In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud. In entering his guilty plea, he told a federal judge in Manhattan:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

---

12 https://www.businessinsider.com/crypto-trading-billionaire-sam-SBF-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed December 16, 2022).

13 https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).

14 https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed December 16, 2022).

**iv. Nishad Singh**

57. Nishad Singh joined Alameda Research in its early days, when the five-person trading firm was based in a Berkeley, California apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to becoming director of engineering at FTX.

58. Singh is thought to be a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a 10-person luxury penthouse in Nassau.

59. He is rumored to be just one of three people who controlled the keys to the exchange's matching engine and may have been informed of a plan to backstop losses at Alameda with FTX customer funds.[15]

60. Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, Berkeley graduate talked about why he left his dream job at Facebook to join Alameda Research in an FTX podcast.[16]

61. "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period when his "day job" was as a software engineer working on applied machine learning

at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda." Singh said.

62. Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

63. In the podcast, Singh said he was also attracted to the company's cultural commitment to effective altruism,[17] a movement that "aims to find the best ways to help others," which he discovered in college.

64. Singh is a board member of FTX Future Fund, a part of the FTX Foundation, a philanthropic collective funded principally by Bankman-Fried and other senior FTX executives.

65. "It was pretty clear that everybody working [at Alameda] was highly motivated, was sort of effective altruism-aligned, which mattered a lot to me and was really [a] bright spot. I could learn a lot from them," Singh said in the podcast.

66. After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried's related projects, including the decentralized exchange Serum on Solana.

67. "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[18] Singh also reportedly built most of FTX's "technological infrastructure" and managed the development team.

68. Although pitched as a community-run and -organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then

---

[15] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).
[16] https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed December 16, 2022).
[17] https://www.coindesk.com/layer2/2022/11/11/how-sam-SBFs-effective-altruism-blew-up-ftx/ (accessed December 16, 2022).
[18] https://blog.ftx.com/blog/raising-the-bar/ (accessed December 16, 2022).

held the program's access keys.[19] A similar relationship may be in place at FTX's core properties.[20]

69. It was recently reported that Singh will plead guilty to criminal charges over his role in FTX's fraudulent scheme and is working to strike a plea deal with New York prosecutors.[21]

**C. FTX's Scheme and Its Collapse**

70. The house of cards collapsed in November of 2022, when FTX imploded, and its over $30 billion in value evaporated overnight. Certain entities associated with FTX filed emergency Chapter 11 bankruptcy petitions in Delaware on November, 11, 2022. The world found out what Bankman-Fried and insiders knew all along: FTX was a true "Ponzi scheme." Without the venture capital early seed money and continued financial and public support, FTX and the FTX Insiders would not have been able to execute their fraudulent scheme—certainly not at its multi-billion-dollar scale. Without the Accounting Firm Defendants' engaged work, third parties—including Plaintiffs—would not have continued to entrust FTX with their assets.

71. Part of FTX's scheme involved employing some of the biggest names in sports and entertainment to raise funds and drive global consumers to invest in the FTX Platform, Yield Bearing Accounts, and/or FTT. Many Plaintiffs recall commercials by celebrities as a reason for turning to FTX. Commercials that featured Kevin O'Leary, Tom Brady, Mark Cuban, Shaquille O'Neal, and others.

72. As discussed, FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency and in turn was very successful. By the time FTX filed for Bankruptcy protection on November 11, 2022, its customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 ***billion dollars.***

---

[19] https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed December 16, 2022).

[20] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed December 16, 2022).

[21] https://www.bloomberg.com/news/articles/2023-02-17/top-SBF-associate-nears-plea-deal-in-us-probe-of-ftx#xj4y7vzkg (last accessed February 23, 2023)

73. Bankman-Fried continued to get rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, in 2020 alone, according to Bloomberg. At his peak, Bankman-Fried was worth nearly $26 billion. One of his largest promotions yet was securing the naming rights to the Miami Heat's NBA arena, formerly held by American Airlines.[22]

74. The relationship between FTX and Alameda was critical to the exchange's eventual collapse. From the outset, FTX customer funds were deposited into Alameda bank accounts and were commingled at the direction and whim of Bankman-Fried.

75. Even though they were two "separate" entities, the division between FTX and Alameda breaks down in a key place: Alameda's balance sheet. That balance sheet was full of the FTT token issued by the FTX exchange that grants holders a discount on trading fees on its marketplace. In essence, Bankman-Fried's trading giant Alameda rested on a foundation largely made up of a cryptocurrency that Alameda's sister company invented, not an intendent asset list, a fiat currency, or another cryptocurrency.

76. The relationship between FTX and Alameda was unusually and improperly blended.[23] Alameda borrowed assets from FTX's customers, contrary to FTX's terms of service and promises made by Bankman-Fried, providing FTT tokens as collateral for those loans. Alameda also engaged in margin trading, essentially borrowing money to execute risky trading strategies, which trades in turn were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements.

77. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022, Alameda borrowed from FTX some of its customers'

---

[22] [22] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

[23] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-SBFs-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 16, 2022).

assets.[24] FTX ostensibly benefitted from interest paid by Alameda for the loaned crypto assets, although some have suggested that the loans were made for free.[25]

78. Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive). Alameda did post collateral to secure these loans from FTX of customer crypto assets, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX was able to create unlimited amounts of FTT.

79. In an Alameda balance sheet leaked in early November, Alameda's largest asset holdings were listed as being FTT tokens. Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Bankman-Fried co-founded).[26] Alameda had few assets that had not been created out of thin air by FTX or FTX-related entities.

80. In early November 2022, crypto publication CoinDesk released a bombshell report that called into question the stability of Bankman-Fried's empire.[27]

81. After obtaining this information, Changpeng "CZ" Zhao, the CEO of Binance, another cryptocurrency exchange, decided to liquidate roughly $530 million-worth of FTT. Customers also raced to pull out, and FTX saw an estimated $6 billion in withdrawals over the course of 72 hours, which it struggled to fulfill.[28] The value of FTT plunged by 32%, but rallied

---

[24] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed December 16, 2022).

[25] https://www.cnbc.com/2022/11/13/sam-SBFs-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed December 16, 2022).

[26] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-SBFs-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed December 16, 2022).

[27] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed December 16, 2022).

[28] https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-SBF-binance-2022-11 (accessed December 16, 2022).

once again after Bankman-Fried's surprise announcement on Tuesday, November 8, 2022, that Binance would buy FTX, effectively bailing it out.[29]

82. The very next day, however, Binance announced that it was withdrawing from the deal, citing as reasons for its decision to withdraw its findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[30] The news sent FTT plunging even further— Bankman-Fried saw 94% of his net worth wiped out in a single day[31]—triggering panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

83. Bankman-Fried issued a 22-tweet-long *mea culpa* in which he explained where he believed the FTX Entities went wrong: [32]

---

[29] https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-SBF-binance-2022-11 (accessed December 16, 2022).

[30] https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed December 16, 2022).

[31] https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-SBF-wealth-wiped-out-2022-11 (accessed December 16, 2022).

[32] https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed December 16, 2022).

SBF
@SBF_FTX

1) I'm sorry. That's the biggest thing.

I fucked up, and should have done better.

8:13 AM · Nov 10, 2022

13.6K Retweets 7,340 Quotes 57.1K Likes 4,272 Bookmarks

SBF
@SBF_FTX

2) I also should have been communicating more very recently.

Transparently--my hands were tied during the duration of the possible Binance deal; I wasn't particularly allowed to say much publicly. But of course it's on me that we ended up there in the first place.

8:13 AM · Nov 10, 2022

312 Retweets 54 Quotes 4,768 Likes 34 Bookmarks

**SBF**
@SBF_FTX

3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE. FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH. THERE ARE APPROXIMATIONS HERE.]

8:13 AM · Nov 10, 2022

344 Retweets 278 Quotes 3,718 Likes 34 Bookmarks

**SBF**
@SBF_FTX

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals. The liquidity varies widely, from very to very little.

8:13 AM · Nov 10, 2022

297 Retweets 315 Quotes 3,444 Likes 35 Bookmarks

**SBF** @SBF_FTX

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin. I thought it was way lower.

8:13 AM · Nov 10, 2022

274 Retweets 463 Quotes 3,283 Likes 68 Bookmarks

**SBF** @SBF_FTX

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours. We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

8:13 AM · Nov 10, 2022

341 Retweets 553 Quotes 3,691 Likes 93 Bookmarks

**SBF** @SBF_FTX

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough. I should have said more. I'm sorry--I was slammed with things to do and didn't give updates to you all.

8:13 AM · Nov 10, 2022

186 Retweets 72 Quotes 2,761 Likes 15 Bookmarks

**SBF** @SBF_FTX

8) And so we are where we are. Which sucks, and that's on me.

I'm sorry.

8:13 AM · Nov 10, 2022

220 Retweets 128 Quotes 2,977 Likes 6 Bookmarks

SBF
@SBF_FTX

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that. To take responsibility, and do what I can.

8:13 AM · Nov 10, 2022

258 Retweets 79 Quotes 3,561 Likes 14 Bookmarks

SBF
@SBF_FTX

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that. But I'm going to try. And give anything I have to if that will make it work.

8:13 AM · Nov 10, 2022

249 Retweets 137 Quotes 3,236 Likes 16 Bookmarks

SBF
@SBF_FTX

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

8:13 AM · Nov 10, 2022

189 Retweets 27 Quotes 2,502 Likes 7 Bookmarks

SBF
@SBF_FTX

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

8:13 AM · Nov 10, 2022

204 Retweets 55 Quotes 2,860 Likes 12 Bookmarks



**SBF**
@SBF_FTX

13) Because at the end of the day, I was CEO, which means that *I* was responsible for making sure that things went well. *I*, ultimately, should have been on top of everything.

I clearly failed in that. I'm sorry.

8:13 AM · Nov 10, 2022

310 Retweets 103 Quotes 3,993 Likes 31 Bookmarks



**SBF**
@SBF_FTX

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

8:13 AM · Nov 10, 2022

181 Retweets 41 Quotes 2,406 Likes 6 Bookmarks

**SBF** 
@SBF_FTX

15) First, one way or another, Alameda Research is winding down trading

They aren't doing any of the weird things that I see on Twitter--and nothing large at all. And one way or another, soon they won't be trading on FTX anymore.

8:13 AM · Nov 10, 2022

**384** Retweets **206** Quotes **3,755** Likes **51** Bookmarks

**SBF** 
@SBF_FTX

16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency--transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know *exactly* what is happening on it.

8:13 AM · Nov 10, 2022

**189** Retweets **115** Quotes **2,158** Likes **19** Bookmarks

SBF
@SBF_FTX

17) All of the stakeholders would have a hard look at FTX governance. I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

8:13 AM · Nov 10, 2022

135 Retweets 54 Quotes 1,800 Likes 14 Bookmarks

SBF
@SBF_FTX

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers. That's it.

8:13 AM · Nov 10, 2022

130 Retweets 11 Quotes 1,887 Likes 3 Bookmarks

**SBF**
@SBF_FTX

19) A few other assorted comments:

This was about FTX International. FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid. Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

8:13 AM · Nov 10, 2022

332 Retweets 419 Quotes 2,693 Likes 53 Bookmarks

**SBF**
@SBF_FTX

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses. So for now, all I'll say is:

well played; you won.

8:13 AM · Nov 10, 2022

1,409 Retweets 1,883 Quotes 7,869 Likes 260 Bookmarks



SBF
@SBF_FTX

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent. I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

8:13 AM · Nov 10, 2022

358 Retweets 678 Quotes 3,316 Likes 99 Bookmarks



SBF
@SBF_FTX

22) And, finally:

I sincerely apologize.

We'll keep sharing updates as we have them.

8:13 AM · Nov 10, 2022

487 Retweets 340 Quotes 5,521 Likes 94 Bookmarks

84. On November 11, 2022, unable to obtain a bailout, Bankman-Fried announced *via* Twitter that FTX and Alameda filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[33]

[33] https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-SBF-ceo-crypto-binance-alameda-markets-2022-11 (accessed December 16, 2022).

85. While the world is still learning exactly what happened at FTX and Alameda in the days and months before their collapse, we do know several pieces of key information that support Plaintiffs' claims here.

86. First, it is quite possible that fiat currency FTX customers sent to the exchange for the purpose of purchasing cryptocurrency may never have resulted in any cryptocurrency transactions. Instead, Alameda may have used those funds to purchase any number of assets, including investing in venture capital firms. In fact, Alameda's balance sheet, in John Ray's first day declaration, lists venture capital assets.

87. Second, when customers withdrew crypto assets from FTX in the past, FTX was likely meeting these withdrawals by selling their own coin, FTT. However, as the price of FTT fell in the wake of liquidation of FTT by the CEO of Binance, it became increasingly expensive for FTX to convert FTT into other crypto assets that matched customers' expectations of their portfolio holding because so many FTX customers were seeking to pull their crypto assets out of the exchange at the same time.

88. Therefore, while customers may have believed they were buying cryptocurrencies that were not securities (*i.e.*, commodities), the economic reality was that they were directly, or indirectly, buying securities in the form of venture capital investments, FTT, SOL, and/or SRM. FTX and all its affiliated entities were effectively a venture capital fund, where "investors," in the form of customers, sent funds to the firm and the firm then did whatever it wanted with these funds, including purchasing securities. The difference is that FTX, unlike venture capital funds generally, was misrepresenting what it was doing with customers' assets.

89. At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[34]

---

[34] https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

90. Later, the Wall Street Journal reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX used customer money to help Alameda meet its liabilities."[35] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[36]

91. CNBC also reported on the relationship among FTX and Alameda, citing "a source familiar with company operations," that Alameda "was able to quietly use customer funds from . . . FTX in a way that flew under the radar of investors, employees and auditors in the process." It did so "using billions from FTX users without their knowledge." CNBC's report explains that FTX, as a crypto exchange, needed to hold enough cash to match customer deposits in the event customers wanted to cash out. "They needed the same cushion, if not more, in the event that a user borrows money to make a trade. According to the source, FTX did not have nearly enough on hand."[37]

92. The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

93. Statements by Bankman-Fried to the Wall Street Journal suggest that about half the balance Alameda owed to FTX was from wire transfers that customers made to FTX *via*

---

[35] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)
[36] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).
[37] https://www.cnbc.com/2022/11/13/sam-SBFs-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (last accessed May 4, 2023).

Alameda in the early days before FTX had a bank account.[38] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[39] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[40]

94. On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> From at least May 2019 through November 2022, Bankman-Fried engaged in a scheme to defraud equity investors in FTX Trading Ltd. ("FTX"), the crypto asset trading platform of which he was CEO and co-founder, at the same time that he was also defrauding the platform's customers. Bankman-Fried raised more than $1.8 billion from investors, including U.S. investors, who bought an equity stake in FTX believing that FTX had appropriate controls and risk management measures. Unbeknownst to those investors (and to FTX's trading customers), Bankman-Fried was orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to help grow his crypto empire. *Id.* ¶ 1.
>
> [F]rom the start, Bankman-Fried improperly diverted customer assets to his privately-held crypto hedge fund, Alameda Research LLC ("Alameda"), and then used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations. *Id.* ¶ 2.
>
> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships,

---

[38] https://www.wsj.com/articles/ftx-founder-sam-SBF-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink (accessed December 16, 2022).

[39] FTX customers deposited more than $5 billion in those Alameda accounts.

[40] *Id.*

> and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4
>
> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

95. The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

**D. Sequoia's Involvement in and Facilitation of FTX's Scheme**

**i. History of Sequoia and Key Players**

96. Sequoia was one of Silicon Valley's most esteemed venture capital firms. As an early backer of Apple Inc., Google, and Airbnb Inc., Sequoia was founded by Don Valentine in 1972. Sequoia earns lucrative investment management fees by pooling capital from its investors, which it then generally invests in pre-IPO companies with a focus on the technology sector. Sequoia thus captures the appreciation of its investments between the time of the funding rounds and the time that the company goes public in an IPO. Thus, because Sequoia invests so early in the life cycle of a company, there is tremendous upside and potential for return that normal investors would never have. Investing decisions are made by Sequoia's general partners (Sequoia calls them just "partners") while limited partners only have a stake in the profits of the Sequoia-managed funds they invest in and do not make any investment decisions.

97. Sequoia is one of the largest venture capital firms in the world with over $85 billion in assets under management in 2022. Sequoia is highly respected among investors with several of its partners being named to *Forbes'* 2022 "The Midas List," which is a list of the "World's Best." Alfred Lin, the Sequoia partner who led the firm's investments into FTX was 7th on The Midas List in 2022 and 1st in 2021.

98. Alfred Lin's career led to these accolades and the perceived credibility that his statements and actions carried. After Harvard, Lin, along with his classmate, sold their first

startup LinkExchange to Microsoft in 1998 for $265 million. Further, Lin was the COO and CFO of the online footwear retailer Zappos. At Zappos, Lin helped the company through Amazon's $1.2 billion acquisitions in 2009. In 2010, Lin joined Sequoia as a partner, where gained even more success. He has been involved in several highly profitable investments for Sequoia, including Airbnb, Uber, DoorDash, and Instacart. In 2012, Lin joined the board of Airbnb. Lin was so successful that *Forbes* even wrote an article about him titled "The World's Best Venture Capitalist Is Not Who You'd Guess."[41]

99. Although, not all investments work out, even for "The World's Best Venture Capitalist." Mr. Lin endorsed FTX and Bankman-Fried until the end and was Sequoia's lead on the investment. Michelle Bailhe was also heavily involved as Lin's co-lead. Bailhe graduated from Brown, spent time at McKinsey & Co., Google, and private equity firm Hellman & Friedman before becoming one of the youngest partners in Sequoia history. Bailhe is known for her heavy involvement in Sequoia's crypto and blockchain-related investments, and she often appears on television to discuss the industry. She heavily promoted Sequoia's investments in FTX, hosting interviews with Bankman-Fried, facilitating the publication of articles touting FTX, and making several television and podcast appearances to promote FTX. Bailhe was not only working alongside Lin, but FTX was her opportunity to stand side by side as a professional equal to the venture giant. This was Bailhe's shot to be in the same conversation as Lin. All she had to do was make sure FTX succeeded.

**ii. Sequoia Invests and Promotes FTX**

100. On July 20, 2021, Sequoia participated in a Series B funding round for FTX that raised $900 million.[42] This valued the company at $18 billion and was the largest funding round for a private cryptocurrency deal in history. Bankman-Fried made clear that the goal of these funding rounds, besides raising money, was to find "***strategic allies who can help FTX grow its***

---

[41] https://www.forbes.com/sites/alexkonrad/2021/04/13/sequoia-alfred-lin-2021-midas-list-new-no-1/?sh=4b32161d6102 (last accessed May 4, 2023).

[42] https://www.bloomberg.com/news/articles/2021-07-20/crypto-firm-ftx-valued-at-18-billion-as-softbank-ribbit-invest?sref=sws2D3xf&leadSource=uverify%20wall (last accessed May 4, 2023).




***brand.***" Bankman-Fried wasted no time going on Twitter as soon as the news broke to announce to his large following that he was "deeply humbled by the support . . . from our new partners."

101. Bankman-Fried also tweeted and tagged each of the venture capital firms that invested in FTX. Sequoia was the *first* partner listed.

> **SBF**
> @SBF_FTX
>
> 2) @FTX_Official has closed ~$900m at a valuation of ~$18B.
>
> @sequoia, @paradigm, @RibbitCapital, @thomabravo, @insightpartners, @SoftBank_Group, @ThirdPointLLC, @lightspeedvp, @bondcap, @coinbase, @sinoglobalcap, @multicoincap, @ptj_official, @vaneck_us, @circlepay, and more
>
> 12:06 PM · Jul 20, 2021
>
> 80 Retweets 72 Quotes 911 Likes 32 Bookmarks

102. Lin commented on a 2021 FTX promotional press release following the deal on July 20, 2021: "FTX is the high-quality, global crypto exchange the world needs, and it has the potential to become the leading financial exchange for all types of assets. Sam is the perfect founder to build this business, and the team's execution is extraordinary. We are honored to be their partners."

103. In July of 2021, FTX had over one million users and was averaging over $10 billion of daily trading volume. After a successful Series B funding round, crypto traders and investors found FTX more legitimate now that successful venture capital firms—especially Sequoia led by Lin— had invested in and endorsed FTX.

104. On October 21, 2021, FTX conducted another round of fundraising and raised over $420 million. Sequoia was an active participant in this round. After this round, FTX was valued just below $25 billion which was $7 billion more than just three months prior. Thus, Sequoia, Lin and Bailhe's initial investment from July 2021 had appreciated by almost 40%. This meant that Sequoia's funding and endorsement of FTX had worked to bring in more deposits and investments from customers. Funding from Sequoia and other large venture capital firms, along with promotional activities by Sequoia and Lin was working. FTX was seen as

more legitimate and, as a result, the user base increased by 48%, and its average daily trade volume increased to $14 billion.

105. Bankman-Fried and FTX used the October 2021 funding round as an opportunity to increase legitimacy and trustworthiness among investors. Bankman-Fried commented on the fundraising round that same day stating:

> We founded FTX two years ago with the idea of creating a better financial marketplace. Today we are focused on establishing FTX as a trustworthy and innovative exchange by regularly engaging with regulators around the world, and constantly seeking opportunities to enhance our offerings for digital asset investors. For this round, we capitalized on those strides and were able to partner with investors that prioritize positioning FTX as the world's most transparent and compliant cryptocurrency exchange.

106. After this second round of funding, Sequoia had invested more than $200 million in FTX. Lin and Bailhe sought to ensure that this investment continued to appreciate. Thus, the media blitz began.

107. On October 21, 2021, Lin was quoted in an FTX company press release as referring to Bankman-Fried as a “special founder who is ambitious and daring enough to build the future of crypto by establishing FTX as the global exchange with the best overall product offering and leveraging the world’s crypto rails to build the future of finance.” Lin again spoke on behalf of his firm, Sequoia, stating that Sequoia was “thrilled to partner with FTX on their next phase of growth.”

108. On November 20, 2021, Bailhe appeared on FTX’s podcast, “The FTX Podcast.” She stated that Sequoia did its “homework” on FTX and Bankman-Fried, and that the investment was based not on Bankman-Fried’s charisma, but on her own and Lin’s strong investment skills. She added, “Alfred [Lin] and I were like ‘No, we do our homework.’ We did our homework way in advance. We knew FTX was this amazing company and we also knew Sam was an amazing founder.”

109. In reality, Sequoia did not do its “homework”. Or if they did, they cheated. Sequoia decided to invest in FTX without doing the proper due diligence because they feared missing out. Sequoia knew or should have known that FTX was fraudulent, but decided to invest

anyways because: (i) Sequoia, unlike retail investors, could afford riskier plays because of how large the firm's balance sheet is; (ii) Sequoia was concerned about having FOMO[43] and missing out on a chance to make the firm, and its partners, very rich as evident by how fast their investment initially appreciated. (iii) Sequoia knew if they partnered with Bankman-Fried they could make FTX look legitimate because everyone in the retail investor community trusted him and would trust Sequoia, one of the largest venture capital firms.

110. Sequoia did not perform the due diligence or else they would have been turned down by FTX. Chamath Palihapitiya, CEO and founder of venture capital company Social Capital, was pitched FTX by Bankman-Fried over Zoom. After just a few short days and a two-page PowerPoint deck of recommendations as simple as forming a board and creating dual-class stock, negotiations with FTX ceased. If a venture capital firm asked questions into FTX's corporate governance or noticed FTX's small insulated circle of decision-makers, the firm would no longer be asked to continue talks with FTX.[44]

111. On November 20, 2021, in the same podcast, Bailhe stated that Sequoia does not just *invest* in companies and then take a hands-off approach. Quite the opposite, or in her words:

> There is a big active conversation throughout. I think we take it probably more seriously than any other firm. We've been debated actually about whether founders would appreciate that or not. The founders we work closely with seem to appreciate it a lot and we try to be really careful. Because we're not just passive money. We want to be really business partners. Not where it's overbearing and we're in your hair but we are partners with you for a decade or however long you want, so it's not okay to back a direct competitor that is going after you if you're not okay with that.

112. On December 17, 2021, Bailhe penned an article published on Sequoia's website, entitled "Ask Not Wen Moon—Ask Why Moon." In this article she further pushed her, Lin's, and Sequoia's narrative that "Sequoia's mission is to partner with the most daring founders in crypto and help them build something legendary. We're proud partners of Sam at FTX[.]" She

---

[43] FOMO means the fear of missing out. Sequoia knew that if they waited even just a few short months, they could lose out on the potential of $200-$350 million in appreciation.

[44] https://www.businessinsider.com/ftx-told-chamath-palihapitiya-social-capital-go-fuck-yourself-recommendations-2022-11 (last accessed May 5, 2023).

elaborates how bullish Sequoia is on crypto and how it is a "firm-wide focus that includes myself (FTX[)], . . . [and] Alfred Lin (FTX)".[45]

113. On December 17, 2021, Sequoia tweeted multiple times from its official Twitter account, promoting FTX, often times quoting Bankman-Fried. One tweet quoted Bankman-Fried where he stated "don't do scammy things."




114. One of the tweets on December 17, 2021, from Sequoia's official account even tagged Mr. Lin and Ms. Bailhe.[46]

---

[45] https://www.sequoiacap.com/article/ask-not-wen-moon-ask-why-moon/ (last accessed May 4, 2023).

[46] https://twitter.com/sequoia/status/1471982150857592837 (last accessed May 4, 2023).




115. On January 31, 2022, FTX completed its Series C funding round and while Sequoia did not participate, it saw its Series B investment appreciate by nearly 90% since July of 2021. After the Series C round, FTX was valued at nearly $32 billion, and FTX's user base had grown another 60%.

116. Bailhe and Sequoia continued peddling this bullish outlook of FTX in the media. She appeared in articles from *CNBC* and *Bloomberg*. Sequoia penned a blog post on *Medium* where it promoted its relationship with FTX and Bankman-Fried.

117. On April 13, 2022, Bailhe hosted an interview with Bankman-Fried for *Startup Grind*, a large conference that many global entrepreneurs attend. She introduced Bankman-Fried as more than just a founder, but almost as a god. She used this interview as an opportunity to show all the entrepreneurs and potential investors there that FTX was on the rise and Sequoia is behind them. In pertinent parts she stated the following:

> "I am thrilled to be here today with a founder that Sequoia is honored to back and that is Sam himself. Sam is the co-founder and CEO of FTX and an exceptional founder and human in so many ways."
>
> She went on later to state: "One of your superpowers is your unbridled ambition. This past year alone, FTX has launched several new products and I would argue made the transition from a product company to a platform company. So, you have the international exchange, you have the US exchange, you have US retail app, you have a proposal in front of the CFTC to change the way that derivatives could work in the US for crypto. And you also have a white label product so that any app that wants to add crypto trading

can do that now via an API. And yet, this is a fraction of what we know you have planned."

118. On September 22, 2022, the icing on the cake for Sequoia's marketing of FTX and Bankman-Fried, just weeks before the collapse of FTX, Sequoia published a now-deleted profile of Bankman-Fried. In it, they again describe him as more of a god than a human. The article was entitled "Sam Bankman-Fried Has a Savior Complex – and Maybe You Should Too." The piece describes Bankman-Fried in superhuman terms, as a super genius who revolutionized cryptocurrency trading.

119. Sequoia used this media piece to further push their bullish agenda of FTX as they described Bankman-Fried as a "risk-neutral" player who was "fully rational about maximizing his income on behalf of the poor." They went so far as to comment on the culture of FTX and how remarkable and "open" FTX is. Sequoia even described FTX's "ethical behavior" as its "competitive advantage."

120. Sequoia edited the article at some point around FTX's collapse. They updated the top of the article noting that "since this article was published, a liquidity crunch has created solvency risk for FTX and its future is uncertain." The article in its entirety has since been removed.

121. Sequoia, Lin, and Bailhe spent months hyping up FTX and Bankman-Fried for the main purpose of ensuring their investment appreciated in value. Sequoia contributed substantially to the "war chest" which paid for FTX's campaigns, sponsorship deals, and charitable wing, which ultimately proved to be critical elements of its fraudulent scam.

122. Almost immediately after FTX filed for bankruptcy in November 2022, Sequoia's leadership, including Lin and U.S. leader Reolof Botha and crypto-focused partner Sean Maguire, held a call with the firm's limited partners to apologize for the firm's $150 million loss due to FTX's collapse. Sequoia told its investors that the firm would improve its due diligence process on future investments, and that it was misled by FTX.[47]

[47] https://www.wsj.com/articles/sequoia-capital-apologizes-to-limited-partners-for-ftx-investment-11669144914 (last accessed February 26, 2023).

123. In a November 9, 2022, memorandum to its limited partners, Sequoia marked its investment down to zero. It also stated: "At the time of our investment in FTX, we ran a rigorous diligence process. In 2021, the year of our investment, FTX generated approximately $1B in revenue and more than $250M in operating income, as was made public in August 2022.[48]

124. Though Sequoia ultimately wrote its FTX investment down to zero, it had previously benefitted from its relationship with FTX and Bankman-Fried: Alameda had invested approximately $200 million into the Sequoia-related funds which invested in FTX.[49]

125. Sequoia thus knew that FTX and Alameda were different companies. Sequoia knew that FTX held investor funds. And Sequoia knew—or recklessly disregarded—that billions of investor dollars were transferred from FTX accounts into Alameda's, and then subsequently transferred out of Alameda's accounts to pay off its debts and to enrich Bankman-Fried, and in Sequoia's case, Sequoia. Sequoia substantially assisted and facilitated this scheme by investing over $200 million into FTX to fund its operations and brand marketing.

126. Shortly after FTX's collapse, the Commodity Futures Trading Commission took interest in FTX's collapse. On January 18, 2023, CFTC Commissioner Christy Goldsmith Romero delivered a keynote address to the Wharton School and the University of Pennsylvania Carey Law School, titled "Crypto's Crisis of Trust: Lessons Learned from FTX's Collapse." In her remarks, the Commissioner explained:

> FTX sought public trust as a way to establish market and investor confidence and ultimately, to grow its business. Its public messaging centered around FTX and its founder Samuel Bankman Fried being trustworthy. Through Congressional hearings, meetings with regulators, and public statements through social media and interviews, FTX projected an image of a company that didn't want to operate in the dark. It said it wanted to play by the rules, and be regulated.

---

[48] https://twitter.com/sequoia/status/1590522718650499073?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1590522718650499073%7Ctwgr%5Ebd469bdb14eceb6d84f07b307e4b5f0b5de9db05%7Ctwcon%5Es1_c10&ref_url=https%3A%2F%2Fwww.businessinsider.com%2Fsequoia-loss-on-ftx-collapse-letter-to-investors-2022-11 (last accessed February 26, 2023).

[49] https://www.ft.com/content/993942cb-1a7e-4689-9d9d-8434d4a74cc5 (last accessed February 26, 2023).

> FTX messaged to potential retail customers that it was trustworthy—a haven in a crypto market suffering from a trust deficit. FTX messaged that it could be trusted more than others in crypto, particularly by regular people. In September 2021, FTX ran ads featuring quarterback Tom Brady and his wife, supermodel Gisele Bündchen, with the tagline, "Crypto. FTX. You in?" In the ad, Brady calls people to tell them about FTX, not famous people mind you, but regular people: a dogwalker, a fishmonger, a guy in a hard hat, a mechanic, a cook, a plumber, and a bartender.
>
> It is now abundantly clear that FTX is not a trusted way to buy and sell crypto. But when this ad aired, FTX had already cultivated a fair amount of trust from the public.
>
> This ad, played today, feels like a violation of trust. Now, this formerly $32 billion company (reportedly) is one of the largest financial industry bankruptcy filings in history. There are likely more than one million creditors. After being brought in to preserve value in FTX for customers and other creditors, current FTX CEO John J. Ray III testified, "This is really old fashioned embezzlement. This is just taking money from customers and using it for your own purpose . . . . This isn't sophisticated whatsoever. This is just plain old embezzlement." FTX's founder and other executives are facing criminal prosecutions and civil prosecutions by the CFTC and SEC. Damian Williams, the U.S. Attorney for the Southern District of New York, described the charges as "one of the biggest financial frauds in American history."

127. The Commissioner further explained that venture capital firms, and Sequoia specifically, were integral to funding FTX's campaign to build trust. She even quoted from the infamous profile on Sequoia's website, and stated the following:

> FTX had financial support for its campaign to build trust. Some venture capital firms (and other investors) knowingly funded this trust campaign. In a now-deleted piece on its website, Sequoia Capital posted the following:
>
> > Alameda was not immune to the exchange-level shenanigans that gave crypto as a whole its sleazy reputation. But FTX had an ambition to change that. It was built to be the exchange traders could count on. Bankman-Fried needed to get the word out. He wanted FTX to be known as the respectable face of crypto. This required ad campaigns, sponsorship deals, a charitable wing—and a war chest to pay for it all.
> >
> > FTX *did* need the money, after all. And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers.

> **FTX appears to have used Sequoia as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto**.
>
> **It appears that Sequoia at least knew its money would be used in this fashion**. However, there are serious questions and allegations about whether this public-relations "war chest" was funded not only by venture capital money but also customer property. If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.[50]

128. Sequoia thus substantially assisted FTX's scheme by knowingly and/or recklessly funding Bankman-Fried's diversion of FTX's customer funds to its aggressive public relationship campaign to build trust, and to prop up Alameda. Had Sequoia conducted even a cursory review of FTX's financial statements—and it claims to have done so by conducting due diligence prior to investing—it unquestionably would have been aware of Bankman-Fried's malfeasance. Instead, it persisted with facilitating FTX's fraudulent scheme.

129.

**E. The FTX Accountants**

130. Defendant Armanino is an accounting firm with its headquarters in California. Armanino claims to be a top accounting firm in the United States, with more than 2000 employees and 24 offices. At the time of the events described above, Armanino had a thriving digital-asset practice. Armanino would market its services to companies in the cryptocurrency market.[51]

131. Armanino's digital-asset practice performed crypto audits, attestations, and other work for private crypto companies, including FTX. Armanino was one of the only larger accounting firms to perform this type of work. Big Four accounting firms avoid providing auditing services to the risk-laden crypto industry.

132. Armanino's digital-asset practice relied heavily on the work it performed for FTX exchange. In fact, many members of Armanino's digital-asset practice left the company to

---

[50] https://www.cftc.gov/PressRoom/SpeechesTestimony/oparomero5 (accessed February 26, 2023).

[51] https://www.coindesk.com/tech/2023/03/01/former-accounting-team-of-ftx-us-auditor-armanino-sets-up-shop-as-the-network-firm/ (last accessed May 4, 2023).

form their own startup—The Network Firm—to carry on the business of providing audits and attestations to crypto clients. The move came after Armanino stopped providing these types of services to crypto clients after the financial collapse of FTX in November of 2022.

133. Armanino audited FTX US and stands by its audits of both 2020 and 2021.[52] These audits provided FTX with a necessary veneer of stability and safety that not only helped FTX and Bankman-Fried conceal fraud, but was a launching point for gaining more investors and their trust.

134. Defendant Prager Metis is a New York limited liability corporation with its principal place of business in New York. Prager is an accounting and consulting firm that was engaged by FTX to perform corporate audits. Prager has more than 700 employees in offices around the world, including five offices in California.

135. Prager strongly markets itself to companies in the technology sphere, including those involved in cryptocurrency. Prager touts its status as the first accounting firm to be open in Meta's "Metaverse."

136. Prager audited FTX Trading Ltd. in 2020 and 2021, and stands by its audits. These audits provided FTX with a necessary veneer of stability and safety that not only helped FTX and Bankman-Fried conceal fraud, but was a launching point for gaining more investors and their trust.

137. Both Armanino and Prager audited the key FTX entities and certified that the companies had satisfactory internal controls in place to protect Class Member funds, despite knowing full well that such controls were not in place. But Armanino and Prager sought to solidify their own profitable relationship with FTX, placing that desire over any concern for the effects that their audits would have on Plaintiffs. Armanino and Prager helped to conceal the fraud of FTX.

138. Both Armanino and Prager are registered with the Public Company Accounting Oversight Board ("PCAOB"), and although they are only required to follow PCAOB standards

---

[52] https://news.bloombergtax.com/financial-accounting/ftx-collapse-puts-auditors-in-crosshairs-of-clients-regulators (last accessed May 4, 2023).

when auditing public companies or broker deals, both Armanino and Prager are familiar with those standards as best industry practices. One of those standards calls for auditors to maintain a "professional skepticism" of their clients with a focus on detecting error and fraud. Neither Armanino nor Prager approached FTX with skepticism at all, let alone "professional skepticism."[53]

139. Although Armanino and Prager must follow the PCAOB because they are small firms, the PCAOB inspects them only once every three years. Larger outfits, like Deloitte, Ernst & Young, PWC, and KPMG refuse to audit crypto startups because of how risk-laden they are.[54]

140. Both Armanino and Prager knew of not only the PCAOB standards, but the standards set out by the Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA"), which apply to audits of non-public issuers and non-reporting companies—like FTX US and FTX Trading Ltd.

141. The standards set out by PCAOB and ASB require that the auditor have sufficient training and proficiency, maintain independence from the company being audited, and adhere to industry standards of care. These standards require that the audit gain a sufficient understanding of the company and gather sufficient evidence to assess the company's financial statements by (i) physically examining the company's inventory or visiting its facilities; (ii) reviewing the company's accounting records; (iii) interviewing, both formally and informally, company employees about their activities, or observing their regular activities; (iv) interviewing, both formally and informally, business counterparties about their dealings with the company; and (v) evaluating the assumptions and choices of accounting principles made by management in preparing the company's financial statements. These are just examples what was demanded by these standards.

---

[53] https://news.bloombergtax.com/financial-accounting/ftx-collapse-puts-auditors-in-crosshairs-of-clients-regulators (last accessed May 4, 2023).

[54] https://www.yahoo.com/video/complete-failure-corporate-controls-investors-141247444.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAFs6EUxkVV9HUg2BjDaNmjnW5JV9qUDUk_NzQsHQCWU2NIzsaQV38WO7NasBWF1mRc32uFlU2Mu2o006tu7FRXIezDEYZ0J_WO5vrQoMV0NoSe-cY-h8mauOZ_oZXrO5iQwb29I9qqV4WeTeJCCvl7YE2fo-9GTBhIIUVvXf17MZ (last accessed May 4, 2023).

142. Neither Armanino nor Prager followed the standards set out by PCAOB and ASB or else they would not have given FTX a clean bill of health and opined that its financials were fairly presented. This is not a surprise for either accounting firm as they both have a history with failing to follow industry standards in order to bolster their respective bottom lines.

143. Armanino issued an opinion on Lottery.com's accounting principles and practices after conducting an audit in 2021. Armanino helped conceal the lottery-sales startup's $30 million overstatement of improperly recognized revenue. There was substantial doubt about its ability to continue as a going concern, and Armanino resigned from its audit role this past September 2022.

144. Prager has a poor track record, too, as a 2020 report of Prager audits demonstrates.[55] According to that report, Prager failed all four of its most recent inspections by the PCAOB, which identified deficiencies and other instances of non-compliance.

145. Indeed, even Congress has taken notice of the lack of consistency meeting the "professional practice standards."

146. FTX and Bankman-Fried benefitted from the work of these auditors. Bankman-Fried took again to Twitter to tout the recent "compliance" with U.S. audit procedures. This helped push the false narrative that FTX is a trustworthy place for investors to place their money, while at the same time, FTX could conceal its fraud. The tweet below, posted on July 31, 2021, touted FTX as successfully passing an audit that supposedly relied on generally accepted accounting principles or "GAAP":

[55] https://pcaob-assets.azureedge.net/pcaob-dev/docs/default-source/inspections/reports/documents/104-2022-138-pragermetis-ny.pdf?sfvrsn=a5c0cb95_4 (last accessed May 4, 2023).

**SBF** @SBF_FTX

1) Yesterday, FTX became the first (?) crypto derivatives exchange to complete a GAAP audit!

1:19 AM · Jul 31, 2021

154 Retweets 65 Quotes 2,122 Likes 39 Bookmarks

**SBF** @SBF_FTX · Jul 31, 2021

2) Whatever its actual impacts, typing that certainly makes me _feel_ old and wise.

> **SBF** @SBF_FTX · Jul 30, 2021
>
> 1) Today, we are older, and wiser
>
> but hopefully, we are still young
>
> Show this thread

4 3 234

**SBF** @SBF_FTX · Jul 31, 2021

3) A huge thanks to everyone who helped get us there!

17 2 261

**house of crypto** @svensteiner2 · Jul 31, 2021

US GAAP, IFRS or local GAAP?

1 1 10

**SBF** @SBF_FTX · Jul 31, 2021

US GAPP

5 2 35

147. On August 26, 2021, Bankman-Fried tweeted again to announce that now FTX US had officially passed its U.S. GAAP audit.




148. FTX and Bankman-Fried used the clean audits as a marketing gimmick to gain the trust of investors by making FTX fraud free.

149. At the same time, Armanino and Prager benefited greatly by agreeing to prepare and certify the audit reports. Both firms market themselves aggressively in the cryptocurrency space. Armanino touts its "industry focused practice serv[ing] digital asset financial service firms, miners & stakers, funds, token projects, and 'crypto-curious companies," including "on-demand audit opinions issued under the most stringent examination standards." Prager advertises that it "works with different companies in the digital assets space from an audit, tax, and advisory perspective, including a top-three global cryptocurrency exchange"—*i.e.* FTX—and is a "leader in the digital assets industry."

150. As reported in the Wall Street Journal, both Armanino and Prager have doubled as both auditors and "crypto industry cheerleaders" in recent years. Each firm has issued public statements in support of crypto-industry companies. It stands to reason that each firm serves as

industry "cheer leaders" in order to grow its revenue by endorsing the cryptocurrency industry players and expanding their respective books of digital-asset-related business.[56]

151. In March of 2022, Armanino and Prager issued certified audit reports giving FTX US and FTX clean bills of health.[57] FTX's bankruptcy administrator has since publicly proclaimed that these reports were unreliable, he wrote that he had "substantial concerns as to the information presented" and did "not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances" of the entities audited. In other words, the administrator was not merely second-guessing these audits; he deems them unreliable from the beginning.

152. In sum, Armanino and Prager agreed to conspire with the FTX Group in its conduct of mis-preparing audits and certifying the reports on behalf of FTX. Given the work they performed and their review of FTX financial records, Armanino and Prager knew or were willfully blind to the nature of the FTX pattern of fraud. Experts have pointed out that Armanino and Prager certified the FTX US and FTX audits in the face of at least four obvious red flags.

153. First, neither was given full access to the scope of the FTX financials or gained an understanding of the interrelationship of the financial health of the FTX group. This made it impossible for either to treat FTX with "professional skepticism." Instead of asking for more information, however, both auditors looked the other direction in order to maintain a business relationship with FTX.

154. Second, neither Armanino nor Prager provided an opinion concerning FTX's internal controls over accounting and financial reporting. They did not provide an opinion because they knew that FTX had unsatisfactory controls. Thus, instead of reporting the truth, they merely concealed it in order to maintain a lucrative relationship with cryptocurrency market players.

[56] https://www.wsj.com/articles/ftx-auditors-doubled-as-crypto-industry-cheerleaders-11668709049 (last accessed May 4, 2023).
[57] https://www.bloomberg.com/news/articles/2022-11-23/-first-accounting-firm-in-metaverse-sucked-into-ftx-meltdown#xj4y7vzkg (last accessed May 4, 2023).

155. Third, neither Armanino nor Prager questioned why FTX had not paid any U.S. federal income taxes despite being, on paper, enormously profitable and subject to the United States' jurisdiction. Again, they turned a blind eye to this giant red flat in order to preserve their own business in the cryptocurrency market.

156. Fourth, Prager did not question the innumerable related-party transactions on display in FTX's financials, including but not limited to transactions in which Bankman-Fried and other insiders were trading on their own exchange for their own accounts, an enormous "software royalty" paid by FTX to Alameda without any satisfactory explanation, the use of related parties to manage FTX currency and treasury activities on an "outsourced basis, and extensive use of the in-house FTT token for variety of purposes, including acquisitions and other related-party transactions.

157. In sum, from their diligence (or purposeful lack thereof) and adherence (or purposeful lack thereof), Armanino and Prager knew or should have known that FTX was misappropriating funds and defrauding investors and the public alike. The assistance provided by Armanino and Prager in the form of sham audits and public endorsements furthered FTX's façade of integrity, legitimacy, and stability, without which Bankman-Fried could not have stolen billions from unsuspecting customers.

## CLASS ACTION ALLEGATIONS

158. As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A. Class Definitions

159. Plaintiffs seek to represent the following Global Class, Nationwide Class, and California Subclass (collectively, the "Classes"):

> **(1) Global Class:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX platform.

**(2) <u>Nationwide Class</u>:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX platform.

**(3) <u>California Subclass</u>:** All persons or entities in the state of California who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX platform.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

160. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all cryptocurrency deposited or invested through an FTX platform by Plaintiffs and the Class Members were made through FTX and its interactive website and mobile app which were accessible to California residents and were actually used to effect commercial transactions with customers in California. Thus, the sales of cryptocurrency deposited or invested through an FTX platform stem from a transactional occurrence that emanated from the State of California. Further, some Defendants are incorporated or have their principal place of business in California.

**B. Requirements of Rule 23(a)**

**1. Numerosity**

161. The Classes are comprised of close to 10 million consumers globally, to whom FTX offered and/or sold cryptocurrency. Moreover, thousands, if not millions, of consumers

worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

**2. Commonality/Predominance**

162. This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether Bankman-Fried, the FTX Insiders and/or FTX committed fraud;

(b) whether Sequoia agreed with Bankman-Fried, the FTX Insiders and/or FTX to commit fraud;

(c) whether the Sequoia had actual knowledge of, or recklessly disregarded, Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(d) whether the Accountant Defendants agreed with Bankman-Fried, the FTX Insiders and/or FTX to commit fraud;

(e) whether the Accountant Defendants had actual knowledge of, or recklessly disregarded, Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

(f) the type and measure of damages suffered by Plaintiffs and the Class members;

(a) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(b) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies because of Defendants' conduct.

**3. Typicality**

163. Plaintiffs' claims are typical of the claims of the members of the Class Members because all members were injured through the uniform misconduct described above, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

**4. Adequacy of Representation**

164. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex class and mass action litigation, and Plaintiffs intend to prosecute this action vigorously and fairly on the Classes' behalf. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**C. Requirements of 23(b)(3)**

**1. Predominance**

165. The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants in aiding and abetting fraud and/or conversion by FTX and the FTX Insiders.

166. Common course of conduct by Defendants includes, but is not limited to: (i) assisting FTX by promoting the fraudulent scheme on reports and social media, (ii) providing retail investors with a rubber stamp of trust by conducting and producing sham audits, (iii) investing millions into FTX without proper due diligence in order to generate a large return on

investment and not miss out on the cryptocurrency craze, and (iv) furthering the façade of integrity, legitimacy, and stability, without which Bankman-Fried and FTX could not have stolen billions from unsuspecting retail investors.

167. Common issues predominate when, as here and stated above, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

168. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**2. Superiority**

169. A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. While some class members may have substantial losses, the vast majority have sustained losses that would not warrant the cost of civil prosecution of their claims on an individual basis. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**D. Requirements of 23(b)(2)**

170. Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct. All Defendants assisted FTX by promoting the fraudulent scheme on reports and social media, provided retail investors with a rubber stamp of trust by conducting and producing sham audits or sham investments, invested millions into FTX without proper due diligence in order to generate a large return on investment and not miss out on the cryptocurrency craze, and (iv) furthering the façade of integrity, legitimacy, and stability, without which Bankman-Fried and FTX could not have stolen billions from unsuspecting retail investors.

**E. Requirements of 23(c)(4)**

171. As it is clear that among the predominant issues regarding Defendants' liability are, but not limited to: (i) whether FTX committed fraud, (ii) whether FTX and FTX Insiders committed conversion, (iii) whether Defendants furthered the façade of legitimacy by investing millions of dollars into FTX, or providing sham audits of FTX, without proper due diligence or by turning a blind eye, (iv) whether Defendants propped up FTX and Brinkman-Fried in efforts to increase their returns or increase their company name in the cryptocurrency sphere.

172. Utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on these issues would materially advance the disposition of the litigation as a whole.

**F. Nature of Notice to the Proposed Class**

173. The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily

and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice as the Court deems appropriate.

## CAUSES OF ACTION

## COUNT ONE

### Aiding and Abetting Fraud

**(Plaintiffs individually and on behalf of the Classes against Sequoia, Armanino, and Prager)**

174. Plaintiffs incorporate paragraphs 1–157 as if fully restated.

175. The FTX Insiders and FTX Entities made numerous misrepresentations and omissions to Plaintiffs and Class Members about the deceptive FTX Platform to induce confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform, and to deposit funds into what was ultimately a fraudulent house of cards. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Entities knew these statements to be false.

176. Plaintiff and the Class members reasonably relied upon Bankman-Fried, the FTX Insiders, and the FTX Entities' material misrepresentations and omissions to invest in cryptocurrency through the Deceptive FTX Platform to their detriment.

177. Sequoia participated in, substantially assisted, and facilitated Bankman-Fried's, the FTX Insiders', and the FTX Entities' fraudulent misconduct, with knowledge that such fraud was cheating investors. For example, while either knowing or consciously disregarding Bankman-Fried's and the FTX Entities' and Insiders' misconduct and red flags, Sequoia (1) provided almost a half billion dollars in additional capital to prop-up Bankman-Fried's and FTX's fraud; (2) advised Bankman-Fried and FTX on ways to scale its business, thereby propagating the fraud and increasing its victims; (3) advertising and propping up Bankman-

Fried's and FTX's legitimacy through news and social media outlets; and (4) attempting to hide the fraud once FTX began to falter so that Bankman-Fried and Sequoia could recover their investment.

178. Armanino and Prager participated in, substantially assisted, and facilitated Bankman-Fried, the FTX Insiders, and the FTX Entities' fraud, with knowledge that such fraud was defrauding investors by, among other things: (1) providing completed sham audit reports; (2) advertising and propping up Bankman-Fried's and FTX's legitimacy through news and social media outlets; and (3) providing Bankman-Fried and FTX with financial advice and consulting services.

179. Sequoia, Armanino, and Prager substantially benefitted from Bankman-Fried, the FTX Insiders, and FTX Entities' scheme, as described herein.

180. Plaintiffs and the Class members suffered damages as a direct and proximate result of each of Defendants aiding and abetting the fraudulent scheme, in an amount to be determined at trial, including punitive damages.

**COUNT TWO**

**Civil Conspiracy**

**(Plaintiffs individually and on behalf of the Classes against Sequoia, Armanino, and Prager)**

181. Plaintiffs incorporate paragraphs 1–157 as if fully restated.

182. The FTX Insiders and the FTX Entities made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Deceptive FTX Platform in order to bolster confidence and to drive consumers to invest in cryptocurrency through the Deceptive FTX Platform and deposit funds into accounts that were misappropriated by Bankman-Fried and the FTX Entities. Defendants misled customers and prospective customers with the false impression that cryptocurrency assets held on the Deceptive FTX Platform were safe and with material

omissions regarding how investor funds would be used. Bankman-Fried, the FTX Insiders, and the FTX Entities knew these statements to be false.

183. Each of the Defendants entered into one or more agreements, and conspired with Bankman-Fried, the FTX Insiders, and/or the FTX Entities and Alameda for the purpose of making these false representations and omissions. Defendants each stood to benefit financially from assisting with this fraud as each would receive additional work from cryptocurrency market players who sought the appearance of legitimacy.

184. Sequoia engaged in unlawful overt acts, including funding hundreds of millions of dollars in either the July 21 Series B funding, the October 2021 Series B-1 funding, or the January 2022 Series C funding and publicly endorsing the trustworthiness and credibility of Bankman-Fried, FTX leadership, and FTX.

185. Armanino and Prager engaged in unlawful overt acts, including providing and completing sham audit reports and publicly endorsing the trustworthiness and credibility of Bankman-Fried, FTX leadership, and FTX.

186. Defendants substantially assisted or encouraged FTX's and Alameda's respective misconduct. Each Defendant had knowledge of the fraud and other misconduct because of their extensive relationship with FTX and their review of FTX financial information, transaction details, and other evidence of this misconduct. Accordingly, each of the Defendants knew that the material misrepresentations and omissions relating to the safety of the Deceptive FTX Platform would result in injury to FTX's customers, including Plaintiffs and the Class members.

187. Plaintiffs and the Class members suffered damages as a direct and proximate result of the conspiracy to commit fraud in an amount to be determined at trial, including punitive damages.

**COUNT THREE**

**Aiding and Abetting Conversion**

**(Plaintiffs individually and on behalf of the Classes against Sequoia, Armanino, and Prager)**

188. Plaintiffs incorporate paragraphs 1–157 as if fully restated.

189. The funds deposited by Class Members into the FTX Platform were personal property of the Plaintiffs and Class Members. Bankman-Fried and FTX wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money. The amount that each plaintiff had in their FTX account that they could not withdraw.

190. Plaintiffs funds were their own. They each had a possessory interest in the sum of money they invested in the FTX Platform.

191. Sequoia, Armanino, and Prager, based on their knowledge of the FTX's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of FTX's conversion of Plaintiffs funds.

192. Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants substantially aided, abetted, and/or participated with FTX in the conversion of funds that belonged to Plaintiffs.

193. Defendants actions, in combination with the actions of FTX, are a proximate cause of actual damages to Plaintiffs and class members. Defendants are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

**JURY TRIAL DEMAND AND PRAYER FOR RELIEF**

Plaintiffs request that the Court enter orders and judgment as follows:

A. Enter an Order pursuant to Federal Rule of Civil Procedure 23 permitting this action, or alternatively specific issues, to be maintained as a class action, appointing Plaintiffs as the representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B. Awarding actual, direct, and compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding restitution and disgorgement of revenues if warranted;

D. Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices, as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all monies required;

E. Awarding attorneys' fees and costs;

F. Awarding prejudgment and post-judgment interest as provided by law; and

G. Providing such further relief as may be just and proper.

H. Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: May 5, 2023

K. Rachel Lanier (SBN 343171)
Rachel.Lanier@lanierlawfirm.com
**THE LANIER LAW FIRM, P.C.**
2829 Townsgate Rd Suite 100
Westlake Village, California 91361
Telephone: (713) 659-5200

W. Mark Lanier (*pro hac forthcoming*)
WML@lanierlawfirm.com
Alex J. Brown (*pro hac forthcoming*)
Alex.Brown@lanierlawfirm.com
John Davis LaBarre (*pro hac forthcoming*)
Davis.LaBarre@lanierlawfirm.com
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204

*Attorneys for the Plaintiffs and the Putative Class Members*